NOT DESIGNATED FOR PUBLICATION

No. 125,524

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

DOMINIC VERSER,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DAVID J. KING, judge. Submitted without oral argument. Opinion filed March 29, 2024. Affirmed.

*Kristen B. Patty*, of Wichita, for appellant.

*Brian Deiter*, assistant district attorney, *Suzanne Valdez*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before GREEN, P.J., HILL and CLINE, JJ.

PER CURIAM: In this appeal of the denial of his K.S.A. 60-1507 motion, Dominic Verser collaterally attacks his convictions for first-degree murder and criminal possession of a firearm. After digging into the record, we find that Verser offers us only speculation—not prejudice. Thus, we affirm.

Verser was convicted of the murder of Olivia Anaekwe, the mother of his child. He was sentenced to a hard 25 life sentence for first-degree murder and 12 months' imprisonment for criminal possession of a firearm. The Kansas Supreme Court affirmed

1

his convictions in June 2014. *State v. Verser*, 299 Kan. 776, 791, 326 P.3d 1046 (2014). The facts surrounding the murder were set out in that opinion and will not be repeated here. 299 Kan. at 777-83.

Verser focuses on two motions: (1) a motion to suppress he filed before trial and (2) a motion concerning a detective's comment during trial that Verser had refused to speak with law enforcement during their investigation. The facts relating to those issues follow.

*The motion to suppress focused on whether there was probable cause to search.*

Before trial, Verser moved to suppress evidence seized from his home. He argued the affidavit on which the warrant was issued lacked probable cause and that officers entered and searched his home prior to obtaining the warrant. The affidavit provided some details:

> "On March 26th at about 2240 hours, officers with the Kansas City, Kansas Police Department were dispatched to the area of [72nd Street and] Gilmore on a call of unknown nature. Within minutes, the call had been upgraded to a homicide. Upon arrival, officers discovered a 2006 silver Suzuki Forenza 4 door sedan . . . located on the street at the intersection of Gilmore and 73rd Drive. A black female, believed to be Olivia Anaekwe, was found lying mostly out of the driver's seat, with her feet still in the vehicle, but her body lying west to east, parallel to the vehicle, with her head closest to the rear. A significant amount of blood and brain matter was present throughout the front passenger compartment, including the driver's floorboard, windshield, dashboard, and driver's side door. Officers observed what appeared to be a gunshot wound to Anaekwe's head, which was the source of the brain matter and blood.
>
> "Officers made contact with Chrishawn Barker, who's [*sic*] mother and brother live at [the residence located near 72nd Street and] Gilmore. Barker told police that her brother, Dominic Verser, and Anaekwe were dating, and had been together that evening

2

at the Gilmore address, talking outside. Neighbors in the area reported hearing a disturbance between two people and what sounded like a gunshot or a mailbox being hit.

"The mother of Verser was uncooperative with police and claimed that Verser's whereabouts were unknown to her."

At the pretrial hearing on the motion, Detective Romulo O'Reilly testified he was called to investigate this homicide just before 11:00 p.m. on March 26, 2009. The homicide occurred at about 10:45 p.m. He canvassed the neighborhood to locate witnesses. O'Reilly testified the neighbors mentioned in the affidavit were Steve and Joyce Ward who lived next door to Verser's home. The Wards advised O'Reilly that they heard screams and a possible argument outside their home. A woman who frequented Verser's home was there near the house speaking with her boyfriend in a light-colored Suzuki between 7:00 and 9:00 p.m. They said they heard a gunshot or a mailbox being hit. Chrishawn Barker advised O'Reilly that her brother, Verser, and Anaekwe were in the Suzuki in the driveway of 7233 Gilmore with their child between 10:40 p.m. and 10:50 p.m.

Detective O'Reilly left the scene around midnight to obtain search warrants for Verser's home and for the Suzuki. When he left, the search had not begun. The officers remaining at the scene were advised to wait until the warrant was obtained. An assistant district attorney wrote the affidavit based on the information O'Reilly provided to her. A judge signed the search warrant at 2:08 a.m. Once the search warrant was signed, O'Reilly called the officers at the scene to let them know it was signed and the search could proceed. The search was in progress when O'Reilly arrived back to the scene.

After this testimony, Verser's trial counsel asserted that the officers entered the house before a judge signed the warrant. The court responded that the defense could present "whatever testimony you want in that regard." A ruling was put off so that the defense could subpoena Officers Johnson and Daniels, who did not have enough notice to

3

be at the motion hearing. There was apparently no further hearing on this matter before trial.

Later, during jury selection, the trial court advised the parties that the court

"was denying the defendant's motion to suppress and I will set forth in some orderly fashion the basis for my ruling, but I'm not going to do that right now. I would just tell you in general it's essentially . . . in my judgment there was not probable cause in that warrant, but . . . [the evidence is] still admissible pursuant to *United States v. Leon*."

Trial counsel argued that the court's decision came before the defense called the two officers to testify about the suppression motion. The court then clarified that its ruling was conditional upon the officer's testimony at trial. The court stated that the testimony could come in during the State's case-in-chief or they could do a hearing outside the presence of the jury on that issue. The prosecutor asked that the testimony on the validity of the search be outside the presence of the jury.

The State filed a motion in limine to prevent the defense from questioning witnesses about the validity of the search warrant in front of the jury. The motion was argued on the morning of the third day of trial. Trial counsel stated that he was not going to argue to the jury that the search warrant was invalid or that the evidence retrieved from the home should not be admitted. Acknowledging the court's prior ruling, he said, "The fact is this court's already ruled. We already know that every item that was found inside of [Verser's home] goes into evidence with the jury." But trial counsel wanted to question O'Reilly concerning the affidavit on the matter of O'Reilly's credibility. The court ruled the defense could point out to the jury that the affidavit was a "sloppily prepared document." And they could allege that affects O'Reilly's credibility. But they could not go into the legality of the warrant to the jury.

4

On the fourth day of trial, Officers Jonathan Daniels and Tykeasha Johnson testified about the search of Verser's home. Daniels testified he was dispatched to the scene at 2:14 a.m. and arrived a short time after that. At around 2:45 a.m., or 30 to 40 minutes after he arrived, officers began to search the residence to look for Verser. Verser's mom was present outside the home. The keys were locked in the house, so she assisted the officers to enter through a window.

On cross-examination, trial counsel asked, "[W]hen you entered into the home the first time just to look for the suspect, were you aware whether a search warrant had been issued at that time or not?" The State objected because the validity of the search was a legal question. The court sustained the objection, noting that the search warrant was issued at 2:08 a.m. and Daniels just testified he was dispatched at 2:14 a.m. and waited 30 to 40 minutes before he entered to look for the suspect. Trial counsel acquiesced, "Okay. That's fine," and excused Daniels.

Johnson testified she was dispatched to the residence around 2:14 a.m. She did not make entry immediately. She thought she entered at about 2:20 a.m. Before she entered, the lights were off in the house and the door was locked. She entered through the window and opened the door for the other officers. Trial counsel did not ask to question Johnson outside the presence of the jury.

Later that day, Officer Lisa Beardsley testified. She was a crime scene investigator responsible for documenting the house after officers performed the search. Just before her testimony on what was found during the search of the home, the court called a bench conference and clarified its ruling on the motion to suppress the search results:

> "THE COURT: Okay. Well, just so that the record is absolutely clear, the defendant's motion to suppress the search of the house is denied. I made the ruling partially on the basis of the search warrant the last time we talked about this I think.

. . . .

"THE COURT: And I basically said that in my view that the *Leon* exception applied and I'm in the process of drafting an order to that effect.

"The other part which I kind of left open, so to speak, was the defendant's issue about this house being searched before the search warrant was issued. And we indicated that I would delay until you heard the testimony of the officers."

After that, both counsel responded:

"MR. DUPREE: Well, Judge, it was my understanding that the court was going to allow me to question the officers concerning what my issues were because I hadn't had the opportunity to question those officers before the court actually . . . made its final decision. When those officers were on the witness stand, the court heard the State's objection, told me that I couldn't get into any evidence or any further into the search warrant issue so . . .

. . . .

"MR. DUPREE: . . . I was trying to . . . question them about exactly when and what time they went into the residence. Specifically I was trying to ask . . . Officer Daniels concerning the first time he went in versus the second time[,] he mentioned things about the fact that the second time they went into the place they had a search warrant. Said first time they went in, they didn't.

"MS. TATUM: No, I object to that.

"MR. DUPREE: They didn't have one in hand.

"MS. TATUM: I object to that."

After due consideration, the court ruled:

"THE COURT: Well, here's the ruling, the motion to suppress is denied. The sworn testimony of . . . the officers . . . that went inside the house indicated that they were dispatched at 2:14. The evidence the search warrants themselves show that they were executed at 2:08. So they were dispatched six minutes after the warrant was issued so I

think anything after 2:08 was legal. . . . But I just want the record to be clear as we move forward that the motion to suppress has been denied.

"MR. DUPREE: Okay. Judge, just for the record so it can be clear is that we, you know, we disagree with the court's decision based on the fact that we were not able to adequately cross-examine or call the officers that we believed were necessary for us to question and talk to for this court to make its decision concerning the search warrant and the invalidity thereof."

Officer Beardsley then testified that during the search of Verser's residence, officers located a live .223 REM cartridge on a dresser and a manual for a Kel-Tec PLR-16 pistol, which fires a .223 round. This evidence was significant because the gun used to shoot Anaekwe was never found, but a casing found under her body revealed the gun fired a .223 cartridge. A firearms expert concluded the gun was likely to have been a Kel-Tec PLR-16 or a Kel-Tec SU-16 rifle. *Verser*, 299 Kan. at 780.

*An officer comments on Verser's choice to remain silent.*

On the sixth day of trial, Angela Garrison, a KCK police detective, testified she was dispatched to a motel after Verser had been arrested. The prosecutor asked, "[D]id you have an opportunity to see the defendant that day?" She responded, "Yes. We—when we left the motel, we went—Detective Bye and I went to the police station to attempt to talk to Dominic, but he refused." There was no objection.

Later, during a bench conference on another matter, the prosecutor raised the issue:

"MS. TATUM: Earlier in Detective Garrison's testimony she mentioned something that was not responsive to my question. She mentioned that Dominic didn't talk to them when they were there. That was not what I elicited. I didn't do that on purpose. I was asking about the hotel room. I skipped right over it because I thought it would be inappropriate for me. I mean there was no objection, but I thought it would be

7

inappropriate for me to draw more attention to it and that's why I've waited 'til now, but obviously for the record, that did happen. I think based on my questions, you can see that I did not elicit that intentionally, but she said it. . . .

"MR. DUPREE: And, Judge, and I, in fact, heard her make the comment and I chose to not object. But again I didn't want to draw that attention to it and my position was to wait until a recess to address that with the court and I do intend on further addressing that with the court at such time that we're out of the presence of the jury, but I did not want to draw any further attention to that during the trial.

"THE COURT: Okay. We will take up that issue then later."

It does not appear trial counsel raised the issue again.

*The district court denied the K.S.A. 60-1507 motion.*

Verser argued (1) his trial counsel was ineffective when he failed to contemporaneously object to the seized evidence at trial as the evidence was introduced to preserve the issue for appeal and instead stated during the trial that the defense was not challenging the search warrant, and (2) his trial counsel was ineffective when he failed to object to testimony from Detective Garrison concerning his right to remain silent and then failed to address the issue with the court afterwards. Verser's appointed counsel filed a supplemental memorandum on the issues.

At the hearing on the motion, Verser's counsel for his direct appeal, Rick Kittle, testified. Kittle testified he did not believe the suppression issue was preserved for appeal. Instead, "it was actually waived by trial counsel, at on[e] point." He cited to the discussion that took place at the beginning of the third day of trial.

Trial counsel testified he objected when the State started introducing the evidence seized from the residence. He could not remember exactly what happened. He did not

8

object to Garrison's comment because it "was said in passing" and he did not want to "draw more attention to it."

The district court later denied the motion. The court ruled that trial counsel made a contemporaneous objection when the State sought to introduce the evidence seized from his residence, citing to the bench conference on day four of the trial during Officer Beardsley's testimony. Kittle's reliance on the discussion on day three of the trial was misplaced because the discussion was about the motion in limine filed by the State to prevent the defense from asking the jury to find the warrant invalid. The suppression issue was preserved for appeal and trial counsel was not ineffective. The district court noted that Verser had not asserted his appellate counsel was deficient for failing to raise the issue on direct appeal. The court also noted that Verser's argument assumed the Kansas Supreme Court would have found the trial court erred in relying on *Leon*, which Verser had not shown. And the court noted the Supreme Court had called the evidence of Verser's guilt "overwhelming." *Verser*, 299 Kan. at 786.

The district court further ruled that the State's witness "impermissibly commented on Verser's invocation of a constitutional right." But the court found trial counsel's failure to preserve the issue did not prejudice Verser. The prosecutor did not solicit the testimony. The State made no further mention of Verser's assertion of his right to remain silent. A mistrial would not have been automatic. A limiting instruction would have drawn further attention to the statement. The court found "no reasonable possibility that the isolated reference to Verser's post arrest silence affected the outcome of this case."

*The rules that guide us are well-established law.*

Claims of ineffective assistance of trial counsel are analyzed under the two-step test articulated in *Strickland v. Washington*, 466 U.S. 668, 687, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984), and adopted by the Kansas Supreme

9

Court in *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985). Under the first step, the defendant must show that defense counsel's performance was deficient. If successful, the court moves to the second step and determines whether there is a reasonable probability that, absent defense counsel's unprofessional errors, the result would have been different. *State v. Evans*, 315 Kan. 211, 217-18, 506 P.3d 260 (2022).

To establish deficient performance under the first step, the defendant must show that defense counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel must be highly deferential. A fair assessment of counsel's performance requires that every effort be made to eliminate the distorting effects of hindsight, reconstruct the circumstances of the challenged conduct, and evaluate the conduct from counsel's perspective at the time. *Evans*, 315 Kan. at 218. A court considering a claim of ineffective assistance of counsel must strongly presume that defense counsel's conduct fell within the wide range of reasonable professional assistance—that is, the defendant must overcome the strong presumption that, under the circumstances, counsel's action might be considered sound trial strategy. *Khalil-Alsalaami v. State*, 313 Kan. 472, 486, 486 P.3d 1216 (2021).

Under the second step, the defendant must show that defense counsel's deficient performance was prejudicial. To establish prejudice, the defendant must show with reasonable probability that the deficient performance affected the outcome of the proceedings, based on all the evidence. A court hearing a claim of ineffective assistance of counsel must consider all the evidence before the judge or jury. *Khalil-Alsalaami*, 313 Kan. at 486. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Evans*, 315 Kan. at 218.

To prevail on a claim of ineffective assistance of counsel based on counsel's failure to pursue and litigate a motion to suppress evidence to its conclusion, a defendant

must show the suppression motion "would have been meritorious, i.e., was likely to be granted" and, but for counsel's objectively unreasonable failure, "there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Khalil-Alsalaami*, 313 Kan. 472, Syl. ¶ 10.

Appellate courts generally will not consider an allegation of ineffective assistance of counsel raised for the first time on appeal. The usual course is for appellate counsel to request a remand to the district court for an evidentiary hearing on the ineffective assistance claim, commonly called a "*Van Cleave* hearing." See *State v. Van Cleave*, 239 Kan. 117, 120, 716 P.2d 580 (1986). Although sometimes an ineffectiveness claim can be resolved when raised for the first time on appeal because the merit or lack of merit of the claim is obvious and the record is sufficient to decide the issue on direct appeal, these circumstances are extremely rare. *State v. Hilyard*, 316 Kan. 326, 338, 515 P.3d 267 (2022).

If an appellant's claim of ineffective assistance of counsel cannot be resolved on the record, the appellate court is not obligated to sua sponte remand for a *Van Cleave* hearing when it has not been requested by the appellant. *Hilyard*, 316 Kan. at 338.

*Trial counsel did contemporaneously object to the admission of the evidence.*

The Fourth Amendment to the United States Constitution guarantees the right to be free from "unreasonable searches and seizures" and that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." A judge deciding whether an affidavit supplies probable cause for a search warrant considers all the circumstances presented and makes "'a practical, common-sense decision whether a crime has been or is being committed and whether there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *State v. Mullen*, 304 Kan. 347, 353, 371 P.3d 905 (2016).

The judicially created exclusionary rule is designed "to deter unlawful searches and seizures by prohibiting the prosecution's use of unconstitutionally obtained evidence." *State v. Perkins*, 310 Kan. 764, 767, 449 P.3d 756 (2019). The Fourth Amendment exclusionary rule should not be applied to bar the use of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be invalid unless

> "(1) the magistrate issuing the warrant was deliberately misled by false information; (2) the magistrate wholly abandoned his or her detached or neutral role; (3) there was so little indicia of probable cause contained in the affidavit that it was entirely unreasonable for the officers to believe the warrant was valid; or (4) the warrant so lacked specificity that officers could not determine the place to be searched or the items to be seized." *State v. Hoeck*, 284 Kan. 441, Syl. ¶ 1, 163 P.3d 252 (2007) (citing *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677, *reh. denied* 468 U.S. 1250 [1984]).

The *Leon* good-faith exception applies when an affidavit does not supply a substantial basis for the determination of probable cause but does provide some indicia of probable cause sufficient to render official reliance reasonable. *State v. Zwickl*, 306 Kan. 286, 295, 393 P.3d 621 (2017).

As a procedural bar to appellate review, K.S.A. 60-404 requires a party to make a contemporaneous objection to issues involving the erroneous admission or exclusion of evidence. *State v. Hillard*, 313 Kan. 830, 839, 491 P.3d 1223 (2021). A party may not object at trial to the admission of evidence on one ground and then on appeal argue a different ground. *State v. George*, 311 Kan. 693, 701, 466 P.3d 469 (2020). The contemporaneous objection rule allows the trial court to reconsider its original ruling after hearing how the evidence unfolds during trial. *State v. Potts*, 304 Kan. 687, 700, 374 P.3d 639 (2016).

Verser argues his trial counsel did not make a specific and contemporaneous objection on day four of the trial that would have preserved the issue on whether the *Leon* good-faith exception to the exclusionary rule applied despite the lack of probable cause in the search warrant. Trial counsel only "continued to beat the dead horse of officers entering Verser's home before the search warrant was issued."

The State argues trial counsel did make a contemporaneous objection and that Verser has not established prejudice related to this issue.

Verser's characterization of his trial counsel's main argument on day four is fair. But right after the trial court stated, "I just want the record to be clear as we move forward that the motion to suppress has been denied," trial counsel stated,

> "[J]ust for the record so it can be clear . . . we disagree with the court's decision based on the fact that we were not able to adequately cross-examine or call the officers that we believed were necessary for us to question and talk to for this court to make its decision *concerning the search warrant and the invalidity thereof*." (Emphasis added.)

The invalidity of the search warrant—not the question of whether the officers entered prior to obtaining the warrant—goes to the trial court's *Leon* good-faith ruling. Based on that language as it appears in the transcript, trial counsel preserved the issue for appeal. The objection occurred during Officer Beardsley's testimony, just after the trial court reaffirmed its ruling that it was denying the motion to suppress on good-faith grounds and just before Beardsley testified that during the search of Verser's residence officers located the .223 REM cartridge and manual for a Kel-Tec PLR-16 pistol. Trial counsel was not ineffective; he did preserve the issue for appellate review.

Verser then argues for the first time on appeal that his trial counsel and appellate counsel were ineffective for failing to ensure the trial court issued adequate findings of

13

fact and conclusions of law about the denial of the motion to suppress to enable appellate review. He argues the trial court's findings are too unclear to determine whether it correctly decided the search warrant lacked probable cause or whether the evidence was admissible under the *Leon* good-faith exception. Verser argues this failure deprived him of the record needed to raise the issue on direct appeal. Then, rather than attempting to show prejudice from counsel's ineffectiveness by arguing the *Leon* good-faith exception did not permit admission of the evidence seized from his home, Verser argues he cannot do so because the trial court never issued findings of fact and conclusions of law in a written order denying the motion to suppress. Yet he asks this court to reverse his convictions and remand for a new trial.

The State argues this court should decline to address this claim for the first time on appeal.

Verser's attempt to sidestep his obligation to show the motion would have been meritorious is unpersuasive. Verser's trial and appellate counsel cannot be considered ineffective for failing to pursue a meritless issue. "If the . . . motion is not meritorious, then trial counsel's failure to litigate the suppression issue cannot be characterized as objectively unreasonable. . . . At the same time, if the motion is not meritorious and the challenged evidence would not have been suppressed, then counsel's omission cannot be prejudicial." *Khalil-Alsalaami*, 313 Kan. at 499.

We will not reverse Verser's convictions without him first showing a "reasonable probability that the deficient performance affected the outcome of the proceedings." *Khalil-Alsalaami*, 313 Kan. at 486. He must show the suppression motion "would have been meritorious, i.e., was likely to be granted" and, but for counsel's objectively unreasonable failure, "there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Khalil-Alsalaami*, 313 Kan. 472, Syl. ¶ 10. In

14

other words, he must show a reasonable probability that he would have won the suppression issue on direct appeal and the court would have reversed his convictions.

Yet Verser has never articulated a reason why the trial court's ruling on the admissibility of the evidence under the *Leon* good-faith exception was wrong. Not at trial. Not on appeal. Not in this 1507 proceeding. Instead, Verser recites the law about the *Leon* good-faith exception to the exclusionary rule and then stops. His arguments pertaining to error and prejudice are based on a speculative premise that he would have succeeded in overturning the trial court's ruling, but he has no argument why he would have succeeded. He could have made this argument in the K.S.A. 60-1507 proceeding based on the existing record and any additional evidence he wanted to present if a meritorious argument existed. We cannot make the argument for him now. It is his burden in a 1507 proceeding.

*Trial counsel's failure to pursue the officer's errant comment did not prejudice Verser.*

Verser argues his trial counsel's failure to raise the issue of Detective Garrison's comment on his invocation of his right to remain silent after the initial bench conference discussion deprived Verser of the issue on direct appeal. He does not argue this issue alone would have warranted reversal of his convictions. But if the Supreme Court had considered this error on direct appeal along with errors the Supreme Court noted in its opinion—admission of prior crimes or civil wrongs evidence and failing to read an answer to a jury question in open court with Verser present—it would have likely reversed Verser's convictions. Verser repeats this cumulative error argument at the end of his brief, arguing that the two errors he alleges here combined with the errors found in his direct appeal would have likely led to the reversal of his convictions.

The State contends Verser's argument about the prejudicial effect of his trial counsel's performance as it relates to the outcome of his direct appeal is unpreserved for

15

our review and that regardless Verser fails to show prejudice from the errors individually or cumulatively.

It is generally impermissible for the State to impeach a defendant with the defendant's post-*Miranda* silence. *State v. Fisher*, 304 Kan. 242, 248, 373 P.3d 781 (2016) (citing *Doyle v. Ohio*, 426 U.S. 610, 618-19, 96 S. Ct. 2240, 49 L. Ed. 2d 91 [1976]), *disapproved of on other grounds by State v. Randle*, 311 Kan. 468, 462 P.3d 624 (2020). But reversal of a conviction is not automatic when such an error occurs. The Kansas Supreme Court has upheld convictions when, for example, evidence of a defendant's guilt was overwhelming and has reversed a conviction where the fact-finder's assessment of the defendant's credibility tended to be a central issue at trial. *Fisher*, 304 Kan. at 249.

A single comment by an officer concerning the defendant's post-*Miranda* silence that was not elicited by the prosecutor has been held to be harmless error in cases where the State did not mention the matter again and the evidence of the defendant's guilt was strong. See *State v. Murray*, 285 Kan. 503, 523-28, 174 P.3d 407 (2008), *abrogated on other grounds by State v. Marshall*, 294 Kan. 850, 281 P.3d 1112 (2012).

Here, trial counsel's failure to pursue the issue did not prejudice Verser. The prosecutor did not solicit the testimony. The prosecutor did not emphasize it. The State made no further mention of Verser's assertion of his right to remain silent. The evidence against Verser was overwhelming. This was not a credibility contest between Verser and the victim. Neither testified. The defense was that "the State hasn't shown what happened beyond a reasonable doubt." There is no reasonable probability that the isolated reference to Verser's postarrest silence affected the outcome of this case.

16

Nor is there any reasonable probability that trial counsel's failure to pursue the issue affected the outcome of his direct appeal. A review of two issues raised in Verser's direct appeal follows.

In his direct appeal, Verser argued the trial court erred by admitting evidence of an incident that occurred between Verser and Anaekwe about three weeks before the murder. Anaekwe had called 911 after Verser kicked her out of his home but kept their baby inside. When an officer arrived, Verser's mother gave the baby to Anaekwe and the officer. The trial court ruled the incident was not a crime or civil wrong under K.S.A. 60-455. The Kansas Supreme Court assumed without deciding that the trial court erred and concluded that any such error was harmless. *Verser*, 299 Kan. at 777, 785-86. The court stated:

> "The evidence against Verser on the two charges in this case was overwhelming. Shortly before the shooting, he was seen in the backseat of Anaekwe's car with her and their baby. Neighbors heard what sounded like an argument between two persons, one female, that ended with a car driving away '[l]oud and fast.' According to Verser's mother, Verser came into the duplex and told her to call 911 because Anaekwe had been shot. Verser's brother testified that he heard Verser admit to doing the shooting. After placing the 911 call, Verser's mother went next door and gave Kevin a heavy object wrapped in a white t-shirt, which, according to Kevin, 'felt like a firearm.' A gun manual and live round found in Verser's bedroom matched the type of gun that ballistics tests indicated was used in the shooting. Before he fled, Verser was seen with blood on his face. Based on this evidence, we hold that the State has carried its burden to establish that there is no reasonable probability any K.S.A. 2013 Supp. 60-455 error affected the outcome of Verser's trial." 299 Kan. at 786.

The Kansas Supreme Court further held it was statutory and constitutional error for the trial court to fail to read the answer to the jury's question in open court with Verser present. *Verser*, 299 Kan. at 789. The jury wanted to see the statements several witnesses had given to the police. The parties agreed with the court's suggested response,

17

advising the jury that the statements were not admitted into evidence. The Kansas Supreme Court held that reversal was unwarranted:

> "The four factors lead us to conclude that there is no reasonable possibility the district judge's failure to read the answer to the jury's question in open court in Verser's presence contributed to the guilty verdicts. The information delivered was not substantive; it added nothing to and subtracted nothing from the evidence before the jury. Reversal is unwarranted when the information communicated outside the defendant's presence is so vanilla." 299 Kan. at 790.

Verser has not shown the alleged errors considered cumulatively were prejudicial. On direct appeal, cumulative trial errors—when considered together—may require reversal of the defendant's conviction when all the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. In assessing the cumulative effect of errors during the trial, appellate courts examine the errors in context and consider how the trial judge dealt with the errors as they arose; the nature and number of errors and whether they are interrelated; and the overall strength of the evidence. If any of the errors being aggregated are constitutional, the party benefitting from the error must establish beyond a reasonable doubt that the cumulative effect did not affect the outcome. *State v. Alfaro-Valleda*, 314 Kan. 526, 551-52, 502 P.3d 66 (2022).

The trial judge's failure to read the answer to the jury question in open court had no impact on the evidence before the jury. Also, Verser has not shown that his trial counsel's failure to pursue the *Miranda* issue at the trial level had any impact at all on his direct appeal. Even if we combine the isolated mention of Verser's refusal to speak with the officers with the alleged error concerning the prior 911 call, we are still not convinced that the results of this trial would have been different. After all, the evidence against Verser was overwhelming.

Affirmed.

18